## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DONNA LINDEMEYER, | : |
| Plaintiff, | : |
| | : Civil Action No. 19-8781 (FLW) |
| v. | : |
| | : **OPINION** |
| ANDREW SAUL, | : |
| Acting Commissioner of Social Security, | : |
| | : |
| Defendant. | : |

**WOLFSON, Chief Judge:**

Donna Lindemeyer ("Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Andrew Saul ("Defendant"), denying Plaintiff disability benefits under Tile II of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence and, accordingly, it is affirmed.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on August 7, 1964 and was 49 years old on the alleged disability onset date of January 31, 2014. Administrative Record 220 (hereinafter "A.R."). Plaintiff completed high school, college, and she obtained a Master's Degree in Corporate Communication. A.R. 95, 446. Prior to her alleged disability, Plaintiff worked as the Director of Communications and Marketing at a non-profit college for more than 13 years, during which she formulated and implemented budgets, and handled advertising, marketing, and public relations matters. A.R. 95, 446.

1

On January 26, 2015, Plaintiff applied for disability insurance benefits, alleging disability beginning on January 31, 2014, on the basis of various mental and physical impairments. A.R. 220. Plaintiff's claims were denied on May 5, 2015, A.R. 152-56, and again upon reconsideration on October 23, 2015. A.R. 158-60. Thereafter, Plaintiff requested a hearing, which was held on August 7, 2017, before ALJ Peter L. Lee. A.R. 91-120. On November 28, 2017, the ALJ determined that Plaintiff was not disabled, and denied her claims for disability insurance benefits. A.R. 67-85. Plaintiff then requested review by the Appeals Council, which was denied on January 31, 2019. A.R. 1-3. Afterwards, on March 20, 2019, Plaintiff filed this appeal.

### A.    Review of the Medical Evidence

On February 3, 2014, Charles P. Ciolino, M.D., ("Dr. Ciolino") performed an initial psychiatric intake evaluation on Plaintiff, and his medical notes include a description of Plaintiff's complaints: "[s]he reports extreme work stress which in recent months has increased in intensity. She feels she has much accountability and responsibility, with little authority. She states that she is coming apart." A.R. 441. Plaintiff explained that she feels depressed and "anxious all of the time," and she reported panic attacks that were "variable in duration, intensity, and frequency." A.R. 441. Dr. Ciolino diagnosed Plaintiff with generalized anxiety disorder, panic disorder without agoraphobia, and depressive disorder; he recommended that she participate in an intensive outpatient program, and he prescribed her Alprazolam and Citalopram. A.R. 442.

Following the initial evaluation, Plaintiff scheduled appointments with Dr. Ciolino for "medication checks" until July 23, 2015. During the course of her treatment, Plaintiff complained of sleep disturbances, panic attacks, and, in some instances, tearfulness. A.R. 429,

431, 433, 435, 439, 458, 461, 464, 467, 470, 473, 476, 479, 482, Plaintiff also reported increased appetite and weight gain, but she expressed a desire to walk more often. A.R. 459, 461, 464, 467, 470, 473, 476. Dr. Ciolino opined that Plaintiff's "significant symptoms of anxiety and depression" prevented her from working at her job, A.R. 429, 431, 433, 435, 437, 439, 453, 459, 462, 464, 467, 470, 473, 476, 479, 482, 485, and progress notes show that Plaintiff experienced low focus, concentration, motivation, and attention; however; she exhibited variable mood and "periods of brighter affect[.]"A.R. 429, 431, 433, 435, 437, 439, 459, 461, 464, 467, 470, 473, 476.

Dr. Ciolino performed frequent mental status examinations on Plaintiff which, in all instances, revealed her behavior was cooperative and calm, and she maintained eye contact; she was oriented in all spheres; her speech was fluent, clear, logical and coherent; she exhibited above average intelligence; her insight, judgment, thought process, and motor activities were all intact; her thought content was congruent and unremarkable; she denied suicidal and homicidal ideations; and she did not suffer from hallucinations, or manic and psychotic symptoms. A.R. 429, 431, 433, 435, 437, 439, 453, 459, 461, 464, 469, 470, 473, 476, 479, 482, 486. However, in general, Plaintiff's mood and affect was sad, anxious, and dysphoric, and, on some occasions, Dr. Ciolino noted that Plaintiff appeared overweight and exhibited decreased personal hygiene. *Id*.

On February 7, 2014, Rosemary Walsh ("Ms. Walsh"), a counselor at Atlantic Behavioral Health, performed a behavioral health assessment on Plaintiff, who complained of work-related stress, including trouble sleeping, anxiousness, and difficulties focusing and remembering. A.R. 353. Upon examination, Plaintiff appeared well groomed and attentive; her behavior was tense; her speech was pressured/rapid; her mood was anxious and depressed; her affect was constricted;

she had appropriate perception; she exhibited paranoid thinking related to her work; her immediate, recent, and remote memory were all intact; she was oriented in all spheres; and she exhibited good insight and fair judgment. A.R. 363. Ms. Walsh diagnosed Plaintiff with major depressive disorder without psychosis, and generalized anxiety disorder. A.R. 364. She opined that Plaintiff was "unable to work due to work stress," A.R. 364, and emailed Plaintiff's Human Resource Office, recommending that she receive short-term disability until March 24, 2014. A.R. 376.

On February 10, 2014, Rozana Alam, M.D. ("Dr. Alam"), the attending physician at Overlook Hospital, evaluated Plaintiff. A.R. 368. Plaintiff presented with complaints relating to work stress, including anxiousness, poor sleep, problems focusing, and restlessness. A.R. 368. Upon examination, Plaintiff appeared moderately overweight; she exhibited some pressured speech; she had no thought process disorder or signs of perceptual distortions and delusional thinking; her mood was anxious; her affect was constricted; she denied suicidal ideations; she was oriented in all spheres; her memory and insight were fair; her concentration was fair to poor; and her judgment was not impaired. A.R. 369. Dr. Alam diagnosed Plaintiff with major depressive disorder without psychotic features, and generalized anxiety disorder. She opined that Plaintiff should participate in an outpatient program three times a week, and weekly individual therapy and medication management. A.R. 369 Plaintiff was prescribed Celexa, Xanax, and Risperdal. A.R. 369.

On April 1, 2014, Robert Lustig, D.O. ("Dr. Lustig"), a gastroenterologist, treated Plaintiff. A.R. 387. Plaintiff denied respiratory, cardiovascular, gastrointestinal, and ear, nose, and throat problems, in addition to abnormalities in gait and losses in strength. A.R. 387. Upon examination, Dr. Lustig observed as follows: Plaintiff's blood pressure was 108/72; her BMI was

40.05; she weighed 219 pounds; her height was 62 inches; she had one plus edema bilaterally in her extremities; and her peripheral pulses were 2+ dorsalis pedis. A.R. 387. Dr. Lustig diagnosed Plaintiff with reflux esophagitis and hypertension, and he prescribed hydrochlorothiazide. A.R. 387.

On March 13, 2014, Robert Dragert, M.D. ("Dr. Dragert") performed a psychiatric evaluation on Plaintiff, who reported complaints of depression, anxiousness, and "job stress." A.R. 414. Upon examination, Plaintiff appeared her stated age; she was alert with an adequate attention span; she was well oriented; she was cooperative, accessible, and maintained good eye contact; her motor activities, thought content, and memory were all normal; her speech was normal in cadence, content, and tone; her mood was anxious and depressed; her affect was appropriate; she did not experience perceptual distortions; her concentration was adequate; her insight was fair to good; she exhibited average intellectual functioning; and her judgment was mildly impaired. A.R. 417-18. Progress notes from March 13, 2014 to April 22, 2014 reveal that Plaintiff expressed work-related anxieties, A.R. 406, 410; however, Plaintiff's mood was "a little better," A.R. 408, 410, her sleep improved, A.R. 406, 408, and she believed that her medications were "helping." A.R. 406. Dr. Drager advised Plaintiff to continue with her current medication regime. A.R. 407.

The administrative record also contains notes from Cardiologist Younus Rakla, M.D. ("Dr. Rakla"), who saw Plaintiff on March 18, 2015. Dr. Rakla rendered the following diagnosis over the course of her treatment: vitamin D deficiency; shortness of breath; hypertensive cardiovascular edema of her lower extremities; hyperlipidemia; congenital mitral insufficiency; hypertensive heart disease, obesity; hypothyroidism; and diabetes mellitus without complications. A.R. 494, 497-98, 616-17. Plaintiff's electrocardiogram revealed normal results,

A.R. 502, and a two-dimensional transthoracic echocardiogram showed mild concentric left ventricular hypertrophy; an ejection fraction greater than 55%; a flow pattern which was suggestive of an impaired left ventricle relaxation; mild lateral and inferior wall hypokinesis; mild dilation in the left and right atriums; mild mitral and tricuspid regurgitation; and elevated right ventricular systolic pressure. A.R. 504. After a follow-up visit on January 27, 2017, Plaintiff's blood pressure was 140/70 and her BMI was 40.2; an electrocardiogram revealed non-specific ST-T wave changes. A.R. 616-17. However, throughout the course of treatment, Dr. Rakla noted that Plaintiff exhibited an even and regular gait, with no apparent limp, shuffle, or disturbance; full and equal motor strength; and intact touch and pain sensation. A.R. 494, 496, 616.

On April 30, 2015, David M. Gelber, Ph.D. ("Dr. Gelber") evaluated Plaintiff for the New Jersey Disability Determination Services. A.R. 444. His report contains the following observations with respect to Plaintiff's appearance: "[Plaintiff] appears . . . well above average weight, not neatly dressed or groomed, hair unkempt and with some odor of unwashed. The visible skin on her arms and face is covered with numerous red patches and she picks at these frequently. She stands, walks, and sits without any apparent discomfort or mobility impairment." A.R. 444. His report also summarized Plaintiff's work related complaints and symptom history, which included "[s]evere psoriasis," 50 pounds of weight gain, inconsistent hygiene practices, panic attacks, sleep disturbances, and work related nightmares and ruminations. A.R. 445. Dr. Gelber documented Plaintiff's activities of daily living, such as taking and picking up her daughter from school, as well as "occasional chores of dishes [and] laundry about once per month." A.R. 447-48. Dr. Gelber opined that Plaintiff appears capable of managing her own funds. A.R. 448.

Dr. Gelber performed a mental status examination on Plaintiff, and observed that her affect was somewhat labile and tearful; her mood was depressed, with no psychotic symptoms, hallucinations, delusions, loose associations, or paranoid ideations; her speech was variable with good articulation, vocabulary, and grammar; she spoke in coherent and well-elaborated sentences; her response time to orientation, cognitive screening, and concentration questions was slow; she was able to sit throughout the 45 minute examination; she was oriented in all spheres; she scored in the average range on vocab and information subtests; she spelled the word "world correctly forward and slowly reversed"; "she was able to recall three common objects, but only one of three following [a] 5 minute delay"; she attempted Serial 7 calculations but gave up; she was able to slowly perform Serial 3 calculations; she had average general intelligence, with marked concentration and short term memory deficits that are likely mood-congruent; her insight was mildly impaired; and her judgment was markedly impaired because of mood symptoms. A.R. 446-47. Dr. Gelber concluded with a diagnosis of major depressive disorder. A.R. 448.

On May 5, 2015, Jesus Soto, Ph.D., ("Dr. Soto") a state agency psychological consultant, conducted an independent examination of Plaintiff's medical documents. A.R. 121-134. Based upon his review, Dr. Soto determined that Plaintiff is able to "[l]earn, understand, and carry out simple work instructions, maintain attention and concentration for two hour periods [without] undue interruptions, perform as per schedule and routine, appropriately interact with supervisors, coworkers and others, and can adequately complete a normal workweek and workday." A.R. 132.

On July 2, 2015, Tomeco Washington, a licensed professional counselor, performed a partial intake evaluation on Plaintiff. A.R. 515. During their session, Plaintiff complained of work-related depression and anxieties, stating that she felt "emotionally abused" and "harassed"

7

at work. A.R. 515. Plaintiff reported that she completed two intensive outpatient programs, and that she attends church "occasionally" and also participates in her daughter's girl scout activities "at times." A.R. 515. Plaintiff explained that she "wants to continue[] with individual therapy and wants to involve her husband[,]" who was having difficulties understanding her symptoms, and that she has trouble completing some household tasks. AR. 515.

On August 3, 2015, Dr. Rashmi Mehta, M.D. ("Dr. Mehta"), performed a psychiatric evaluation on Plaintiff, during which she complained of financial stressors, because she was fired from work "while on disability . . . and feels traumatized"; migraines; anxieties; obsessions and compulsions; and a lack of concentration because of her anxieties. A.R. 517. Dr. Mehta noted that Plaintiff received a perfect score on a mental status/memory exam, and he diagnosed her with major depressive disorder, single episode, with psychiatric features; generalized anxiety disorder; and obsessive-compulsive disorder. A.R. 519-20. Dr. Mehta prescribed Celexa, Wellbutrin, and Alprazolam. A.R. 521. After the evaluation, Dr. Mehta treated Plaintiff until January 2017.

From September to December 2015, although Plaintiff raised complaints regarding the ineffectiveness of her medication, A.R. 642, financial stress, A.R. 651, hearing sounds/voices, A.R. 651, 653, 655, and one major depressive episode, A.R. 655, Dr. Mehta's notes reveal that Plaintiff was non-compliant with her medication; his notes from 2015 also indicate that Plaintiff had asked if he had informed the "board of social services that . . . she cannot concentrate," and that "[Plaintiff] appears to be manipulative." A.R. 642-43, 653, 655. In 2016, Plaintiff continued to report hearing sounds/voices, A.R. 657, 660, 663, 665, 677, 679, 686, as well as situational anxieties, A.R. 684, 693, 696; a panic attack that occurred while she was traveling in January; A.R. 657; on one occasion, difficulties breathing while walking/climbing, A.R. 660; migraines,

A.R. 663; mood swings, A.R. 679; sleeping issues, A.R. 660, 679, 684; and a loss of motivation/trouble completing chores, A.R. 679, 686, 693. However, Dr. Mehta's notes from 2016 reveal that Plaintiff reported that "she's no [longer] confused," and she "feel[s] less paranoid"; moreover, Dr. Mehta assessed that Plaintiff's medication and a partial care program in which Plaintiff participated "continue[d] to help reduce target symptoms," improve[d] her "coping" and "socialization" skills, and provided Plaintiff with "structure." A.R. 660-61, 665, 675, 677, 679, 684, 686, 693, 695. In addition, Plaintiff ceased having panic attacks in September 2016, A.R. 686, 695, and, in October and November 2016, Plaintiff was capable of traveling to Florida for over one week and the Bahamas for more than two weeks, without reporting difficulties or problems to Dr. Mehta. A.R. 695-696. In her last session from 2016, Plaintiff reported that "she's doing better physically," she lost weight, and "she's doing better with her migraines." A.R. 695. In 2017, Dr. Mehta again noted that Plaintiff was not suffering from panic attacks, and that her medication continued to help reduce her target symptoms. A.R. 700.

Dr. Mehta performed frequent mental status exams on Plaintiff over the course of her treatment, which, for the most part, revealed as follows: her appearance was neat and appropriate; her behavior was preoccupied; her mood was anxious; her affect was full; she exhibited normal motor activities; her speech was normal; her though process was goal directed; she experienced auditory hallucinations; she was oriented in all spheres; she possessed fair judgment and insight; her cognitive functions were intact; and she denied suicidal and homicidal thoughts/ideations. A.R. 642-43, 651-52, 654-58, 660-61, 663-680, 684-85, 686-87, 693-96, 699-700.

On September 2, 2015, Lauren A. Cohen, Ph.D., ("Dr. Soto") a state agency psychological consultant, conducted another independent examination of Plaintiff's medical records. A.R. 136-150. Dr. Cohen opined that Plaintiff's symptoms were a byproduct of a "highly stressful work situation," concluding that she could "[l]earn, understand, and carry out simple work instructions, maintain attention and concentration for two hour periods [without] undue interruptions, perform as per schedule and routine, appropriately interact with supervisors, co workers and others, and can adequately complete a normal workweek and workday." A.R. 145.

**B.      Review of Testimonial Record**

Plaintiff appeared and testified at a hearing in this matter, held on August 7, 2017, before the ALJ. A.R. 34-62. Plaintiff testified that she was 53 years old and that she has a Master's Degree. A.R. 95. Plaintiff stated that she worked as the director of communication and marketing at a college for more than 13 years, where her duties consisted of formulating and implementing budgets, and handling advertising, marketing, and public relations matters. A.R. 95-96. However, she stopped working after she had a "breakdown" and was terminated. A.R. 98.

Plaintiff explained that she completed two intensive outpatient programs, following which she received treatment from Dr. Ciolino. A.R. 98-99. Plaintiff testified that she was attending "Richard Hall" twice a week, which she described as a partial care facility center. A.R. 99-100. Plaintiff claimed that she suffered from the following mental ailments: panic attacks, which cause her to "scratch a lot"; anxiety; depression; difficulties concentrating, focusing, and following instructions; obsessive compulsive disorder; and auditory hallucinations. A.R. 101-106.

In addition to her mental ailments, Plaintiff testified that she suffered from debilitating migraines, heart palpitations, and diabetes; Plaintiff stated that she is 5'2'' and weighs 225 pounds. A.R. 109-10. Plaintiff further stated that her activities include making breakfast, sleeping, and watching television, although she had trouble focusing on shows. A.R. 108, 111. Plaintiff explained that she does not feel comfortable in public or around people, but that she takes/picks her daughter up from school, and that she does not travel "far" with her car. A.R. 112.

### C.   ALJ's Findings

The ALJ issued a written decision, following the hearing, on November 28, 2017, and applied the standard five-step process to determine if Plaintiff had satisfied her burden of establishing disability. A.R. 67-85. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 31, 2014, the alleged onset date, and through the relevant period. A.R. 19.

Second, the ALJ found that Plaintiff had the following severe impairments: "affective disorder, anxiety disorder, obsessive compulsive disorder, hypertensive heart disease, diabetes mellitus, hyperlipidemia, hypertension and obesity." A.R. 69. Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. part 404, subpart P, app. 1. A.R. 26-27. Moreover, in this step, the ALJ considered Plaintiff's physical medical impairments pursuant to listings 4.00, 4.04, and 9.00, and her mental impairments under listings 12.04 and 12.06. A.R. 71-74.

Fourth, the ALJ determined that Plaintiff retained the residual function capacity to perform light work with the following limitations: "[she] can never climb ropes, ladders, or

scaffolds, and can never be exposed to unprotected heights or hazardous machinery. Additionally, [she] can occasionally climb stairs and ramps, she can never crawl, and occasionally stoop and crouch. Further, [she] cannot have exposure to extremes in environmental conditions or concentrated pulmonary irritants. Additionally, she can have occasional contact with supervisors and co-workers, no contact with the public, and is able to do only simple and routine tasks." A.R. 74.

Fifth, the ALJ found that, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." A.R. 84. In reaching this determination, the ALJ relied on the testimony of a vocational expert that an individual with Plaintiff's age, education, past relevant work experience, and residual functional capacity could perform the following representative occupations: (1) Price Marker DOT# 209.587-034; (2) Mail Clerk DOT# 209-687026; and (3) Office Helper DOT# 239.567-010, which the vocational expert testified existed in the regional economy and national economy in the aggregate amount of 158,000. A.R. 84.

## II.    STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination

14

of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S.  at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R.  §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id*.

## III.  PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff raises three arguments on appeal. First, Plaintiff argues that the ALJ erred at the third step for two reasons: (1) he did not consider "the combined effect" of her severe medical impairments; and (2) he did not find that the Paragraph B criteria under Listings 12.04 and 12.06 were satisfied. Second, Plaintiff contends that the ALJ erred in formulating the RFC, as he concluded that Plaintiff could perform "unskilled light work" without setting forth a sufficient explanation, or assigning proper weight to the opinions of Plaintiff's treating doctors. Third,

Plaintiff maintains that the ALJ committed error, because he did not pose a question that incorporated all of her medical limitations to the vocational expert. The Court addresses each in turn.

### A.     Combined Impairments

Referencing *Torres v. Commissioner*, 279 Fed. Appx 149 (3d Cir. 2008), Plaintiff first argues that the ALJ erred at Step Three, because he failed to "compare the combined effect" of her severe impairments. Plaintiff's Brief ("Pl.'s Brief"), at 11. At Step Three, an ALJ is required to consider each of the claimant's individual conditions in determining whether a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 has been satisfied. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). In addition, if the claimant has "a combination of impairments, no one of which meets a listing," the regulations require the ALJ to "compare [the claimant's] findings with" other potential "analogous listed impairments." *See* 20 C.F.R. §404.1526(b)(3). Therefore, at this particular step, the ALJ should review the record and determine whether the ailments in combination are equal to the enumerated impairments. *See* 20 C.F.R. § 404.1523 ("In determining whether [a claimant's] physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law," an ALJ must "consider the combined effect of all of [a claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.").

Here, the ALJ determined that Plaintiff suffered from five severe physical impairments, including hypertensive heart disease, diabetes mellitus, hyperlipidemia, hypertension, and obesity. A.R. 70. The ALJ then identified the relevant Listings, and concluded that Plaintiff's impairments did not meet or equal the clinical criteria set forth in each one, including 4.00

(Cardiovascular Impairments); 4.04 (Ischemic Heart Disease); and 9.00 (Endocrine Disorders).[1] A.R. 70. Moreover, although a specific listing for hypertension is not enumerated in the regulations, the ALJ explained that he, nevertheless, considered "its impact" in formulating the RFC. A.R. 70. In making these findings, the ALJ recounted Plaintiff's medical records, and explained his reasoning in a manner that allows for "a meaningful [judicial] review." *See Burnett v. Commissioner of SSA*, 220 F.3d 112, 119-20 (holding that the ALJ must "set forth the reasons for his decision" and "develop the record and explain his findings") (citing *Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981)). Indeed, Plaintiff does not dispute these particular findings; rather, she argues that the ALJ did not consider her diabetes and obesity in combination with the impairments identified above.

Although obesity was removed as a "listed impairment" in 1999, the Third Circuit has recognized that "this did not eliminate obesity as a cause of disability." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009) (citing SSR 00-3p, 2000 SSR LEXIS 5, 65 Fed. Reg. 31039, 31040-42 (May 15, 2000)). Instead, "the Commissioner promulgated [Social Security Ruling] 00-3p, 2000 SSR LEXIS 5 . . . . This SSR replaced an automatic designation of obesity as a Listed Impairment, based on a claimant's height and weight, with an individualized inquiry, focused on the combined effect of obesity and other severe impairments afflicting the claimant." *Id*.

In 2002, SSR 00-3p, 2000 SSR LEXIS 5 was superseded by SSR 02-1p, 2000 SSR

---

[1]     Plaintiff contends that her hyperlipidemia diagnosis "is not mentioned at all at step 3." Pl.'s Brief, at 19. However, in a later section of the decision, after recounting the pertinent medical record evidence, the ALJ concluded that Plaintiff's hyperlipidemia was "controlled with treatment." A.R. 79. In addition, hyperlipidemia is addressed in Listing 104.14, which a claimant's ailments will meet if, *inter alia*, he or she satisfies the criteria set forth in Listing 4.04. In that regard, the ALJ identified Listing 4.04 when he evaluated Plaintiff's coronary heart disease, and ultimately concluded that her physical ailments did not meet the criteria set forth therein.

LEXIS 5, 67 Fed.Reg. 57859-02 (Sept. 12, 2002), but SSR 02-1p, 2002 SSR LEXIS 1 did not

materially amend SSR 00-3p, 2000 SSR LEXIS 5. *See Diaz*, 577 F.3d at 503. SSR 02-1p, 2002

SSR LEXIS 1 provides:

> [W]e consider obesity to be a determinable impairment. The provisions . . . remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's [RFC].
>
> [W]e will find that an individual with obesity 'meets' the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting . . . impairments, including mental disorders.

SSR 02-1p, 2002 SSR LEXIS 1; Titles II and XVI: Evaluation of Obesity, 67 FR 57859-02. In

*Diaz*, the Third Circuit cited SSR 02-1p, 2002 SSR LEXIS 1 and confirmed that "an ALJ must . .

. consider the effects of a claimant's obesity, individually and in combination with her

impairments, on her workplace function at step three and at every subsequent step." *Diaz*, 577

F.3d at 503.

Here, the ALJ adhered to his requirements under SSR 02-1p. Indeed, while an ALJ is not

obligated to state that he considered a claimant's impairments in isolation and as a whole, in Step

Three, the ALJ explained that he addressed Plaintiff's "physical impairments . . . singly and in

combination" in rendering his findings.[2] *Gainey v. Astrue*, No. 10-1912, 2011 U.S. Dist. LEXIS 44369, at \*34 (D.N.J. Apr. 25, 2011) ("[W]here the ALJ has indicated that the impairments have been considered in combination, there is 'no reason not to believe' that the ALJ did so.") (quoting *Morrison v. Comm'r of Soc. Sec.*, 268 Fed. Appx. 186, 189 (3rd Cir. 2008)). To that end, the ALJ referenced the requirements of SSR 02-1p, before discussing various medical complications that can result in obese individuals. A.R. 75. With those in mind, the ALJ stated Plaintiff's weight and height, and referenced record evidence in concluding that Plaintiff's obesity was "controlled with treatment," including notes from her treating doctors that revealed "normal" and "regular" gait, full motor strength, and no edema in her lower extremities. A.R. 79. The ALJ also accounted for Plaintiff's limitations in formulating an RFC that restricted her to "light work," not involving climbing ropes, ladders, scaffolds, or crawling. A.R. 74. Thus, in reviewing the ALJ's decision, as a whole, I find that the ALJ complied with his obligations pursuant to SSR 02-1p in Step Three, and at subsequent steps of the 20 C.F.R. § 404.1520 analysis.

In addition, diabetes mellitus was removed as a listed impairment in 2011. In its place, the Commissioner promulgated SSR 14-2p, to "provide information about the kinds of impairments and limitations that result from diabetes mellitus. It also provides guidance on how we evaluate (DM) . . . under titles II and XVI of the Social Security Act." SSR 14-2p, 2014 SSR

---

[2]     To be clear, the Court does not hold that an ALJ adheres to the obligations under the pertinent regulations, if he or she merely indicates that a claimant's impairments have been considered together or in combination. Rather, a court should give credit to such statements when the ALJ renders a decision, such as the one here, that allows for a meaningful judicial review, on the basis of having provided a sufficient explanation of the medical record evidence, and the reasoning behind the ALJ's determinations. *See, e.g., Wright v. Comm'r of Soc. Sec.*, No. 15-3965, 2016 U.S. Dist. LEXIS 137542, at \*28 (D.N.J. Oct. 4, 2016) (finding that the ALJ conducted an appropriate combination analysis, where the decision included "extensive review of the record evidence and clearly articulated reasons for how this evidence was weighed and credited.").

LEXIS 4. Moreover, according to SSR 14-2p, an ALJ should consider a claimant's diabetes in combination with obesity, as the regulation provides: "a person with [diabetes] and obesity may have more severe complications than the effects of each of the impairments considered separately. For example, in adults, neurovascular complications of [diabetes] may result in an amputation of a lower extremity. The neurovascular impairment, along with obesity, may make successful rehabilitation with prosthesis more difficult. Although neurovascular complications are rare in children, obesity increases the likelihood of developing these complications." *Id*; *see also Moore v. Berryhill*, No. 17-5152, 2019 U.S. Dist. LEXIS 73624, at *17-18 (D.N.J. Apr. 30, 2019).

Here, the ALJ complied with his obligations under SSR 14-2p. Indeed, in his decision, the ALJ recognized that "there is no longer a specific listing for Diabetes Mellitus." A.R. 71. Nonetheless, the ALJ cited to Listing 9.00B5, which governs the manner in which endocrine disorders (diabetes) are evaluated, and, in accordance with that regulation, determined that the medical record contains "no evidence of end organ damage," or related "complications of Diabetes." A.R. 70-71. Moreover, after explaining that Plaintiff's impairments were examined "in combination," the ALJ recounted the pertinent record evidence, and concluded that her diabetes, too, was "controlled with treatment." A.R. 79. In particular, the ALJ referenced treatment notes from Plaintiff's cardiologist, who diagnosed Plaintiff with diabetes mellitus "without complications" in 2017, and performed various examinations which revealed no focal neurological deficits, and that Plaintiff exhibited full motor strength and intact sensation.[3] A.R.

---

[3]    During the in-person hearing, in response to a question from the ALJ, Plaintiff explained that she sees her doctor "every six months" for her diabetes, and that, during her last visit with the doctor, she was instructed to "[j]ust . . . keep taking [her]" medication (Metformin). A.R. 101. Indeed, Plaintiff did not describe a single complication that stems from her diabetes diagnosis.

79. And, in formulating Plaintiff's RFC, the ALJ included various postural and environmental restrictions, therefore accounting for the limitations which stemmed from her diabetes diagnosis. As such, the ALJ considered Plaintiff's diabetes under SSR 14-2p, and throughout the sequential evaluation process.[4]

Moreover, Plaintiff's reliance on the Third Circuit's unpublished decision in *Torres* is misplaced. There, the "entire combination analysis" was confined to "one cursory paragraph[,]" with no development of the record, or explanation as to the ALJ's medical determinations. *Torres*, 279 F. App'x. at 149. However, unlike that case, the ALJ, here, rendered a decision which indicates that he considered the appropriate factors and regulations, and evaluated the pertinent medical record evidence, before determining that Plaintiff's impairments, considered alone and in combination, do not warrant a finding of *per se* disability under the relevant listings. *See Ibanibo v. Colvin,* No. 14-2303, 2015 U.S. Dist. LEXIS 107649, at *11 (D.N.J. Aug. 17, 2015) (distinguishing *Torres* where the ALJ issued a decision that "cited the evidence and set forth the reasons for his decision[,] and holding that, to require more would "elevate form over substance") (quotations and citations omitted); *Wright*, 2016 U.S. Dist. LEXIS 137542, at *28 (distinguishing *Torres*, because the ALJ issued a decision which allowed for a meaningful judicial review).

---

[4]    Plaintiff's arguments regarding the Step Three evaluation fail for another fundamental reason. In raising such a challenge, a claimant must "identify [the] impairment listing [that] the ALJ should have determined that [her] impairments, when considered in combination, met or equaled." *Mares v. Colvin*, No. 14-7507, 2015 U.S. Dist. LEXIS 151556, at *30 (D.N.J. Nov. 9, 2015) (citing *Gainey v. Astrue*, No. 10-1912, 2011 U.S. Dist. LEXIS 44369, at *35-36 (D.N.J. Apr. 25, 2011)); *see also Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007). Here, Plaintiff identifies Listing 4.04 (Ischemic Heart Disease), and contends that her cardiovascular impairments are "the medical equivalent of that listing when combined with her other impairments." Pl.'s Brief, at 20. However, Plaintiff fails to address the required criteria under that Listing, and, instead, relies on various, general findings and diagnosis in arguing that she is *per se* disabled. As such, Plaintiff's vague contentions do not suffice to show that the ALJ erred in failing to determine that her medical impairments, in combination, are equivalent to Listing 4.04.

Plaintiff also challenges the ALJ's findings with respect to her mental impairments at Step Three. In particular, Plaintiff contends that the ALJ should have determined that her mental impairments met or equaled the Paragraph B criteria under Listings 12.04 and 12.06; Plaintiff however, does not dispute that she does not meet the criteria set forth in Paragraph C of both Listings. Pl.'s Brief, at 24. Paragraph B of Listings12.04 and 12.06 are identical, requiring medical evidence showing an extreme limitation of one, or a marked limitation of two, of the following areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 CFR, Part 202, Subpt. P, App'x 1.

Here, the ALJ did not error in his application of the Paragraph B criteria under Listings 12.04 and 12.06. In particular, the ALJ determined that Plaintiff's limitations in the areas of mental functioning are moderate. In rendering his findings, at Step Three, the ALJ considered a functional report in which Plaintiff described various subjective mental complaints that she reiterated during the hearing. A.R. 72-74. The ALJ also noted that "no State agency psychological consultant concluded that a mental listing is medically equaled." A.R. 74. Rather, the state consultants assessed moderate limitations with respect to Plaintiff's mental functioning and abilities to complete work related tasks. A.R. 74. In addition, the ALJ evaluated and provided a detailed account of the medical evidence from Plaintiff's treating psychiatrists, albeit in Step Four.[5] *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (explaining that the ALJ

---

[5]     Although Plaintiff takes issue with the ALJ's discussion of the objective psychiatric evidence at Step Four, her argument is misplaced. Indeed, the ALJ's decision, viewed in its entirety, demonstrates that he considered the appropriate factors in determining that Plaintiff did not meet the requirements of Listings 12.04 and 12.06. *See Torres v. Saul*, No. 18-1716, 2019 U.S. Dist. LEXIS 190120, at *28 (D.N.J. Oct. 31, 2019) (explaining that a reviewing court "must determine whether the evidentiary discussion—*regardless of its placement in the ALJ's*

is not required to "use particular language or adhere to a particular format in conducting his analysis"). Such evidence included numerous mental status evaluations which showed that Plaintiff exhibited intact insight, judgment, and thought process, as well as records from recent appointments with Dr. Mehta, who opined that Plaintiff's medication and treatment "continue[d] to help reduce target symptoms," improve[d] her "coping" and "socialization" skills, and provided her with more "structure." A.R. 429, 431, 433, 435, 437, 439, 453, 459, 461, 464, 469, 470, 473, 476, 479, 482, 486, 642-43, 651-52, 654-58, 660-61, 663-680, 684-85, 686-87, 693-96, 699-700. Thus, based on the decision, read as a whole, I find that the ALJ's determinations with respect to Plaintiff's mental functioning are based on substantial record evidence.[6]

To the extent that Plaintiff disagrees with the ALJ's conclusions under the Paragraph B criteria of Listings 12.04 and 12.06, it is axiomatic that such grounds fail to provide an appropriate basis for appeal; indeed, reviewing "courts are not permitted to re-weigh the evidence or impose their own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011); *Zirnsak v. Colvin*, 777 F.3d 607, 611 (A reviewing court "must not substitute [its] own judgment for that of the fact finder."). Therefore, because I conclude that the ALJ's medical determinations are based on substantial evidence, his Step Three findings remain undisturbed.

### B.    RFC Determination

Next, Plaintiff contends that the RFC is not based on substantial evidence for two reasons: (a) the ALJ rendered a decision that "offers no explanation . . . for its "unskilled light

---

*decision*—supports a finding of not disabled at Step Three pursuant to the applicable legal standards.") (emphasis added).

[6]    Although Plaintiff disputes these findings on the basis of certain treating doctor opinions, in the decision, the ALJ identified proper grounds for discrediting them, as further explained *infra*.

work" RFC determination; and (b) the RFC is based on an improper rejection of the opinions of Plaintiff's treating doctors. Pl.'s Brief, 29-30. The Court will address Plaintiff's arguments in turn.

A claimant's RFC "is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999) (citing 20 C.F.R. § 404.1545(a)). In that connection, an ALJ will meet his obligation in formulating a claimant's RFC if he "consider[s] and explain[s] his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." *Burnett*, 220 F.3d at 121. Therefore, "[i]n making an RFC determination, an ALJ must discuss both the evidence that supports his conclusion and the evidence that was rejected." *Garibay v. Comm'r of Soc. Sec.*, 336 F. App'x 152, 156 (3d Cir. 2009) (citing *Burnett*, 220 F.3d at 121; *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981)). Otherwise, "in the absence of such [a discussion], the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. Ultimately, "[w]here the ALJ's findings of fact are supported by substantial evidence" a reviewing court is "bound by those findings, even if we would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (2012).

Here, the ALJ adhered to his obligations in formulating a RFC for Plaintiff. In particular the ALJ concluded that Plaintiff could perform light work, with the following work-related limitations:

> the claimant can never climb ropes, ladders or scaffolds, and can never be exposed to unprotected heights or hazardous machinery. Additionally, the claimant can occasionally climb stairs and ramps, she can never crawl, and occasionally stoop and crouch. Further, the claimant cannot have exposure to extremes in environmental conditions or concentrated pulmonary irritants. Additionally, she

24

> can have occasional contact with supervisors and co-workers, no
> contact with the public, and is able to do only simple and routine
> tasks.

In accordance with his obligations under controlling Third Circuit precedent, the ALJ discussed

the medical records that supported his findings, in addition to the evidence that was rejected in

his decision. For instance, the ALJ identified the records and opinion medical evidence

substantiating his assessment that Plaintiff can perform "unskilled light work." In particular, as

to Plaintiff's physical impairments, such evidence included the following: numerous

examinations from her treating doctor's revealing "normal," "full," "equal," and intact motor

functioning and "strength" in all of Plaintiff's extremities, A.R. 417-18, 429-486, 494, 496, 616;

642-700; various treatment notes that documented a "normal," "even," and "regular" gait, with

no apparent limp, shuffle, disturbance, or "loss in strength," A.R. 387, 494, 496, 616; medical

notes documenting Plaintiff's desire to exercise and walk more often; A.R. 459, 461, 464, 467,

470, 473, 476; treating opinions revealing that Plaintiff had intact touch and pain sensation, 494,

496, 616; Dr. Gelber's intake assessment, during which he observed that Plaintiff was able to sit

throughout the entire 45 minute exam, A.R. 446-47; medical records which revealed that

Plaintiff's physical impairments were "controlled with treatment"; and the determinations of

state consultants Drs. Brenda Concepcion and Nawal Abdelmessieh, opining that Plaintiff's

"physical impairments are non-severe." A.R. 81.

The ALJ also identified medical records that supported his determination that Plaintiff

could perform jobs which required no more than "simple and routine" work-related assignments.

In particular, as to Plaintiff's mental impairments, such evidence included the following:

frequent mental status exams revealing that Plaintiff possessed above average intelligence, A.R.

429-86; treatment notes indicating that Plaintiff's insight, judgment, and thought process were all

intact, with unremarkable thought content, A.R. 429-86, 642-700; medical records that documented normal immediate, recent, and remote memory functioning, 363, 369, 417-18, 519-20; various chores which Plaintiff was able to complete, and two vacations to the Bahamas and Florida, with no reported problems, 695-96; medical opinions indicating that Plaintiff's functional limitations were "mood-congruent," arising from a "highly stressful" job situation requiring skilled work, A.R. 145, 446-47; Plaintiff's own reports of improved symptoms, A.R. 660-61; medical notes from recent appointments with Dr. Mehta, indicating that her medication "continue[d] to help reduce target symptoms," improve[d] her "coping" and "socialization" skills, and provided Plaintiff with "structure," and that she ceased having panic attacks, A.R. 660-95, 700; and the opinions of state medical consultants Drs. Soto and Cohen, opining that Plaintiff could "[l]earn, understand, and carry out simple work instructions," and "maintain attention and concentration for two hour periods [without] undue interruptions[.]" A.R. 121-34, 136-50.

In addition, the ALJ provided appropriate reasons for discrediting the evidence that conflicted with his RFC assessment. For example, in 2014 and 2015, various counselors and medical providers assigned GAF scores to Plaintiff, which ranged from 42-50.[7] A.R. 80. However, the ALJ accorded these findings "partial weight," explaining that GAF scores represent a "snapshot" of a claimant's current functioning, and present vague one-time assessments which do not reflect a claimant's overall capabilities over a significant period. *See Hughes v. Comm'r Soc. Sec.*, 643 F. App'x. 116, 119 (3d. Cir. 2016) (noting "that the latest edition of the Diagnostic and Statistical Manual of Mental Disorders abandoned the GAF scale

---

[7]     GAF refers to an individual's score on the Global Assessment of Functioning Scale. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32. In that connection, the scale is used as a tool which reflects the "clinician's judgment of [an] individual's overall level of functioning," in light of a patient's overall impairments in psychological, social, and occupational functioning. *Id.*

as a measurement tool," and that an ALJ should not "give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence."); *see also Burley v. Barnhart*, No. 04-4568, 2005 U.S. Dist. LEXIS 19803, at *14-15 (E.D. Pa. Sept. 9, 2005) (holding that the ALJ's rejection of the claimant's GAF scores was appropriate, because those scores "are unreliable, non-scientific assessments of overall mental functioning."). Moreover, the ALJ concluded that Plaintiff's GAF scores in the "serious" range were inconsistent with the results of her mental status examinations, which revealed normal findings time and time again. A.R. 80.

In addition, Plaintiff's husband completed a third-party report indicating that Plaintiff is unable to remember or multitask, concentrate, understand, follow written and spoken instructions, and get along with others; he further indicated that Plaintiff's attention span lasts between two to five minutes, and she cannot complete tasks and assignments. A.R. 82. However, in according "partial" weight to this assessment, the ALJ explained that Plaintiff's husband is not a reliable medical source, as defined under the applicable regulations, and that his opinions are based on "casual observations, rather than objective medical . . . testing." A.R. 82. *See* 2006 SSR LEXIS 5, at *5 (noting that opinions from "other sources," including "[s]pouses, cannot establish the existence of a medically determinable impairment."). The ALJ also determined that the statements of Plaintiff's husband "do not outweigh the accumulated medical evidence," and, as a whole, are inconsistent with the medical record and the opinions of the state medical consultants who determined that Plaintiff was capable of performing unskilled light work A.R. 82. *See Malcolm v. Comm'r of Soc. Sec.*, No. 16-8646, 2017 U.S. Dist. LEXIS 196512, at *51 (D.N.J. Nov. 20, 2017) (finding that the ALJ did not commit error in assigning "little weight" to the

opinion of the plaintiff's aunt, "in light of the inconsistencies between her opinion and the evidence in the record.").

Furthermore, Dr. Gelber, a state consultative examiner, evaluated Plaintiff in 2015 and concluded that "her mood was markedly depressed," she exhibited "marked concentration and short term memory deficits," and she had difficulties with certain "cognitive screening questions." A.R. 81. However, in attributing "partial weight" to Dr. Gelber's opinion, the ALJ citied to subsequent records where Plaintiff reported an improvement in her mental impairments. A.R. 81. In addition, Dr. Gelber's findings represented an assessment of Plaintiff's then-current functioning, instead of a long-term assessment of her work-related functional limitations; in that connection, the ALJ referenced treatment notes from 2017 from Dr. Mehta, who opined that Plaintiff's medication and treatment had helped to "reduce" her "targeted symptoms." A.R. 79. *See*, *e.g.*, *Goldie v. Berryhill*, No. 16-1186, 2017 U.S. Dist. LEXIS 119445, at *7 (W.D. Pa. July 21, 2017) (finding that the ALJ did not error in rejecting the determinations of a consultative psychologist, because his opinions constituted a "one-time snapshot" of the plaintiff's functional limitations).

The ALJ also discredited the opinion of Dr. Ciolino, who treated Plaintiff from 2014 through 2015. With respect to treating doctors, the regulations provide that "the ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)). Furthermore, although an ALJ must consider the opinions of treating doctors, "[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ" where it is not well supported or there is contradictory evidence. *See Chandler*, 667 F.3d at 361 (alteration in original) (citations omitted); *see e.g.*,

*Money v. Barnhart*, 91 Fed. Appx. 210, 213 (3d Cir. 2004) (affirming the ALJ's decision to discredit a medical opinion on the basis that the opinion was "inconsistent with other medical evidence").

Under 20 C.F.R. § 404.1527(c)(2), a treating source's opinion will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record. Several factors may also be used to determine the weight given to a medical opinion including: the length of the treatment relationship; the nature and extent of the treatment relationship; supportability by the medical evidence; and consistency with the record as a whole. Id. If a treating source's opinion conflicts with that of other medical sources, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). In that connection, the ALJ is required to depend on "contradictory medical evidence" in rejecting the treating source's opinion, rather than, for example, "credibility judgments, speculation or lay opinion." *Id*. An ALJ is also required to provide "an explanation of the reasoning behind [his] conclusions," including "reason(s) for discounting rejected evidence." *See Fargnoli v. Halter*, 247 F.3d 34, 43 (3d. Cir. 2001).

Here, the ALJ complied with the regulations in assigning "limited" or "partial" weight to the opinions of Plaintiff's treating doctor. For instance, Dr. Ciolino, Plaintiff's treating psychiatrist, in various treatment notes from 2015, concluded that she was "unable to work." A.R. 80. However, in according "limited weight" to these determinations, the ALJ explained that Dr. Ciolino opined on an issue that was reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work'

does not mean that we will determine that you are disabled."); *see also Conover v. Colvin*, No. 13-6413, 2014 U.S. Dist. LEXIS 172150, at *39 (D.N.J. Dec. 12, 2013) (holding that "the ALJ properly determined that the . . . opinion [of the plaintiff's treating doctor that she was] . . . not capable of working [was] not entitled controlling weight because [that is an] opinion[] reserved to the Commissioner."). Moreover, Dr. Ciolino's opinion addressed whether Plaintiff was able to return to her previous job—not whether she could perform "unskilled" work—and the ALJ identified recent records showing that Plaintiff's condition had improved. A.R. 79.

Moreover, as an additional basis to reject the opinions of Plaintiff's treating physician, the ALJ referenced the state medical agency consultants' findings, both of whom determined that Plaintiff was able to "[l]earn, understand, and carry out simple work instructions, maintain attention and concentration for two hour periods w/o undue interruptions, perform as per schedule and routine, appropriately interact with supervisors, coworkers and others, and can adequately complete a normal workweek and workday." A.R. 132, 145. Significantly, the medical determinations of the state consultants with respect to Plaintiff's abilities are consistent with the ALJ's RFC, which limits Plaintiff to jobs that require nothing more than simple and routine tasks.

Based on these circumstances, in total, the Court holds that the ALJ did not err in discrediting the opinions of Plaintiff's treating physicians. *See Craig v. Comm'r of Soc. Sec.*, No. 13-4454, 2014 U.S. Dist. LEXIS 164064, at *30 (D.N.J. Nov. 21, 2014) ("If, however, a treating physician's opinion is contradicted by other medical evidence in the record, including the opinion of a non-treating physician, the ALJ may accept the most credible medical opinion.") (citing *Plummer*, 186 F.3d at 429); *see also Schmits v. Astrue*, No. 08-1971, 2009 U.S. Dist.

LEXIS 48182, at *23 (D.N.J. June 9, 2009) ("Furthermore, given the well-delineated contradictory medical evidence identified by the ALJ in her opinion, the Court finds that the ALJ was entitled to accept the most credible medical opinion, even if provided by . . . a non-treating physician").

In sum, because the ALJ considered the evidence that was presented before him, including the objective medical evidence, and articulated reasons for discrediting that which conflicted with the RFC assessment, the ALJ adhered to his obligations in formulating Plaintiff's RFC.

### C.    Hypothetical Questions

Finally, Plaintiff contends that the ALJ committed error, because he posed questions to the VE which did not include all of her "credibly established imitations." Pl.'s Brief, at 33. I disagree.

In reference to hypothetical questions that are posited to a VE, the Third Circuit has held that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *See Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984).  However, *Podedworny* does "not require an ALJ to submit to the vocational expert every impairment *alleged* by a claimant." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). Rather, it requires posed hypotheticals to "accurately portray the claimant's impairments . . . ."  *Id*. at 399 (internal quotations removed). Therefore, the ALJ's hypothetical questions are required only to convey "to the vocational expert all of a claimant's *credibly established limitations*." *Id*. at 554 (citing *Plummer*, 186 F.3d at 431). A limitation is

credibly established if it is medically supported and otherwise undisputed by the record. *Id*. at 554.

At the hearing, the ALJ provided the VE with four hypotheticals, including the following question:

> [t]he first hypothetical is at the light exertional level with the following limitations, never climb ropes, ladders or scaffolds, never be exposed to unprotected heights or hazardous machinery, occasionally climb stairs and ramps, never crawl, occasionally stoop and crouch, never have exposure to extremes in environmental conditions or concentrated pulmonary irritants, occasional contact with supervisors and coworkers, no contact with the public and able to do only simple and routine tasks. Under that exertional level and those limitations . . . would there exist any other positions within the national economy for someone so situated as the claimant in terms of her age, education and work experience.

A.R. The VE answered that question in the affirmative, indicating that Plaintiff could perform the following jobs: price maker, office helper, and mail clerk. Significantly, for the reasons described above, the ALJ's hypothetical was based on an RFC that reflected Plaintiff's functional limitations; therefore, the VE's statements as to the jobs which Plaintiff can perform constitutes substantial evidence that she is not disabled.[8] *See*, *e.g.*, *Plummer v. Apfel,* 186 F.3d

---

[8]     Although Plaintiff cites to *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2002), for the proposition that the ALJ's question to the VE was deficient, that case is distinguishable. There, the Third Circuit found that the ALJ committed error, because he failed to formulate an RFC that accounted for the claimant's limitations, who often suffered from deficiencies in persistence, concentration, and pace. However, unlike *Ramirez*, the ALJ, here, found that Plaintiff exhibited "moderate" limitations in concentration, persistence, and pace, and limited her to "unskilled light work" which required nothing more than simple and routine tasks. *See Menkes v. Astrue*, 262 Fed. Appx. 410, 412 (3d Cir. 2008) ("The term 'simple routine tasks,' in the context of the disability proceedings, generally refers to the non-exertional or mental aspects of work. For example, performing a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration. . . . Having previously acknowledged that [the claimant] suffered moderate limitations in concentration, persistence and pace, the ALJ also accounted for these mental limitations in the hypothetical question by restricting the type of work to 'simple routine tasks.'"); *see also Rodgers v. Colvin*, No. 13-75, 2014 U.S. Dist. LEXIS 134184, 1 n.1 (W.D. Pa. Sept. 24, 2014) (distinguishing *Ramirez*, where the ALJ concluded that

422, 431 (3d Cir. 1999) (finding that, "the vocational expert's testimony was in response to a hypothetical that fairly set forth every credible limitation established by the physical evidence. As such, it can be relied upon as substantial evidence supporting the ALJ's conclusion that [the plaintiff] is not totally disabled.") (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).

Moreover, Plaintiff's reliance on the VE's response to a question that included Plaintiff's discredited functional limitations is misplaced. In particular, in response to a question assuming that Plaintiff would be "off task 15% or more of the workday" and "absent from work three or more days per month," the VE testified that, under those conditions, Plaintiff would be unable to work. A.R. 119. However, the ALJ determined that Plaintiff could perform "simple and routine" work, which finds support in the record for the reasons provided above, and therefore, the ALJ was not required to find that Plaintiff was disabled on the basis of this particular response from the VE. *See Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (holding that the ALJ was not required to accept a response from the VE, based on functional limitations that the medical record did not support); *see also Williams v. Colvin,* No. 13-5566, 2015 U.S. Dist. LEXIS 4767, at *57 (E.D. Pa. Jan. 15, 2015) (finding that the ALJ was not required to credit a VE response to a question which assumed that the claimant could not maintain concentration and attention at work, because the medical record did not support that the claimant exhibited those functional limitations).

---

the claimant exhibited "moderate limitations in concentration, persistence, or pace . . . .") (citations omitted).

**IV.    CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed. An appropriate Order shall follow.

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. Chief District Judge